Case number 10-2520 and re the Marriage of Stone. Good morning and our apologies for the delay in getting to this case. But as you can hopefully see, it came from our desire to give every case the time that's required, regardless of the time constraints that are usually formally set. And we're going to do that in your case, too. Please be seated. But lawyers, if you would be kind enough to approach and identify yourselves for the record. Good morning. Jason Ades and Jennifer Cantrell on behalf of Roberta Stone. Norman Finkel and William Kline on behalf of Robert Stone. All right. Thank you. And the appellant may go first. You may please record. Michael Stone is the son of Roberta and Robert Stone. Michael has suffered from cognitive and psychological disabilities since he was three and a half years old. He's been receiving social security disability for over 20 years since he was approximately 19. Mr. Ades, I'm sorry for the interruption, but hopefully you gained from watching our first argument. I can assure you we've all read the briefs in great detail and understand the factual underpinning. So if you would just proceed on with your argument. Certainly. The trial court aired in three. There never was any adjudication of disability in Michael's case. All we have is the social security payments that are made and a recital and a settlement contract that actually labels Michael's condition. Is that right? Well, it does several things. The marital settlement agreement provides that Michael was not emancipated at age 24. There was a provision within the marital settlement agreement, 513 support for that. We don't know about emancipation because that's a calculation made under Baumgartner on a case-by-case basis. No question. But it did appear in their marital settlement agreement, acknowledged by the parties, incorporated in a judgment. In the recital? In the recital. But the recital of that marital settlement agreement was incorporated entirely in the judgment for dissolution of marriage. Do you really think that a court's incorporation of a settlement agreement constitutes a judicial finding on each of the factual issues or only on the ultimate bottom-line results reached in the settlement? Well, I think that is. And how could that count as race judicata if the court hears no evidence on it, since race judicata is an equitable doctrine? And for the court to make a finding that would then stand up against other litigation would be certainly inequitable in view of the fact that there was no determination made by the court itself except through the adoption of the settlement. Well, two points. The first is that whether or not you find it to be race judicata, there was overwhelming evidence that the parties believed that Michael was disabled and not emancipated at the time of their divorce. Now, that's true. And that's where the argument of your opponent, that it's only in the recital and not in the contract, falls, because that may be as far as having contractual vigor of being a predetermined by contract law. That would stand up against that, but would not stand up against the evidentiary implication as to what both parents felt. And we can't forget also that Mr. Stone, when he testified at the prove-up of his divorce, acknowledged that Michael was disabled and that during the proceeding pre-decree, there was an attorney for the child, Joy Feinberg, that was appointed to represent Michael's interests, notwithstanding that he had already reached the age of majority. And the only reason why there would be such an appointment is because, in fact, he was not emancipated and was disabled. Mr. Addis, if the trial court, if we were to affirm the trial court's finding that he was fully emancipated, does that require any other finding then as far as whether or not he's disabled under any standard? I believe it does not, Your Honor, because Section 513 provides that application for disability support, given a pre- or post-reaching majority. Well, so are you agreeing that if we were to conclude that he is a fully emancipated adult person, that it really matters little whether he suffers from some kind of disability? That is correct. If today, if the ruling was that as of the filing of Roberta's petition to increase support, he was emancipated, Michael was an emancipated adult, whether he is disabled then is not relevant. All right. Now, there's some kind of contest here about the standard of review. And you seem to suggest it's de novo or? I do. And the suggestion that it's de novo on the issue of emancipation of a single adult. Well, Baumgartner preempts that issue, doesn't it? It does. In very explicit terms. And in that sense, contradicts the city of Belleville, which ordinarily makes some mixed questions of law and fact subject to a clearly erroneous standard. But in Baumgartner, the facts, the historical facts of emancipation are subject to manifest weight determinations, while the ultimate conclusion as to whether what those historical facts denote insofar as whether he's emancipated or not, is subject to de novo. So under this manifest weight, kind of a tough road to hoe. Well, I believe that regardless of... Nine days of testimony, were there not? There was nine days of testimony. However, I believe that the decision was against the manifest weight if you decide to adopt that standard. I believe that de novo, clearly under Baumgartner, is the standard of review. But even if you were to apply manifest weight, looking at emancipation... And remember, the timing of the case was such that Baumgartner's decision was issued just after the trial court issued its initial ruling and before the motions for reconsideration were heard. And Baumgartner was the first general discussion about emancipation since the 1920s. And shed light on the case in a way that respectfully, I believe, the trial court erred. And that is to look at specifically whether or not the acts being alleged constitute emancipation, lead to the financial independence of the child. And that analysis was completely missed by the trial court. And in fact, the Baumgartner decision specifically states that you should look at the conduct and whether that conduct leads to financial independence. Whose care, custody, and control would you say he was really under? Well... It has to be one of the two parents, right? Well, I don't believe that that's necessarily so, Your Honor. So just someone other than a parent? Well, I think that a disabled person can reach a certain level of independence, a modest level of independence, and that is live in their own apartment. Sure. Are you really suggesting today that our focus would not be upon the mother and father of the person? Not necessarily. What cases would you cite for this new thought? Well, the cases largely involve children that are still of minority age. I mean, the general definition of emancipated is to release a child from parental control. And I think that's part of the analysis. But what I would say here is that the evidence of trial showed that when Mrs. Stone, Mrs. Stone was the parent that was in charge prior to moving to California. Okay. When she moved to California, she relinquished parental control to her son, Michael. Excuse me, Dan. Well, why wasn't parental control relinquished when he moved out? Whether it's because of advice of the father to, so to speak, become eligible for Social Security, or whether it was even Michael's own decision. When he moves out, basically parental control is dissipated, isn't it? Well, Baumgartner says that you can't impose self-emancipation, that the analysis is whether or not the move out from the parent's home is one that is voluntary. And the unrobotic testimony was that Michael moved because his father moved him out of the house, and Michael himself testified that he didn't want to move. So I don't believe that there is such a bright-line testimony. Well, I didn't quite get those conclusions as being as concretized as you present. First, there was nothing here about coercion, and there was nothing here to negate the fact that Michael bought into his father's rationalization that you want to become eligible for Social Security payments, therefore even though you have other reasons why you may want to stay, you're going to move out. Isn't that consistent with apparently other decisions about, at least arguably, about whether to continue to work more hours when it might have an impact on the Social Security payments that are made? I mean, there's certainly a level of emancipation, or take emancipation out of it, there's certainly a level of self-sufficiency. We can all agree what one end of the spectrum looks like, and we can all agree what the other end of the spectrum looks like, but I think we can all agree that there is some disability here of some nature, and the question is whether the decision of the trial court that this was somebody who has been emancipated is a defensible decision. Well, I think that that's the question. I think that when you look at the totality of the circumstances, and particularly the way that Michael is living, and the fact that he can't afford his rent, even with the Social Security, and even with some part-time, unskilled labor salary that he's able to collect. He can't pay his rent. He lives on furniture that he takes from the garbage. He can't afford a meal out. He can't afford a dinner. And the statute was set up to protect persons like Michael, while encouraging them to do their level best. Did the agreement, though, when it was actually signed off on, provide for the kind of situation you're describing now, when they agreed to contribute $50 a month? Even back in 19, what was it? Ninety-three. Ninety-three. Was that really a realistic, I mean, are you describing something that fits with what the parties agreed to, even back in 93, about, you know, the need to provide for him in a full way? The Merit of Settlement Agreement only says that he is to receive 513 support. There's no other specific statement that says that his support is going to be limited in any kind of a fashion. And the evidence that was in front of him. What I'm saying is, back then, was $50 a month enough to provide for all these things that you're saying he can't provide for now? It clearly wasn't. However, what was important and clear at the hearing, and Mr. Stone testified to it, was that Mr. Stone, at the time, said that he could not afford to pay anything more, and what about the assistance of non-parents? Would that count towards his financial independence or his dependence? Here, there is evidence that his brother, Danny, paid $400 a month towards his rent. Does that count towards his being financially independent, if he has the de facto commitment of third parties to assist him? Well, I'd submit that Dan had no legal obligation to do so. He testified that he was doing it to save his brother, so his brother wasn't out on the street. But on which side of the ledger does that fall? Does that fall on the side of independence or dependence? I think it falls on the side of dependence. Well, doesn't dependence mean dependence on parents? Supposing someone has an annuity and is incapable of earning it from actual employment, wouldn't that count towards his independence? I think, Your Honor, that it's dependence, and it doesn't get charged against him, because it was that very dependence that caused him to be in court, in addition to his father's change in circumstances, whereby he was able very easily to contribute significantly to his care that brought him there. So to then penalize him because someone else was willing to step in and pick up the slack while he was attempting to assert his rights, I don't think would be a fair result or an equitable result at all. There's a bit of a contest, too, about the assets of Mr. Stone. Is it true that the piece of real estate is actually in trust for members of the family? Is that correct? It's correct, but it's a revocable trust. It's a living trust. He has sole control of the asset during his lifetime. As it is now, there are shares among different trusts. Each of them include one of the three children. Technically, I believe that that's accurate. Although, again, I would suggest that, and this was on the butt of a trial, that he has the use of all of his assets at his sole discretion during his lifetime. But this is a piece of real estate that isn't exactly liquid, is it? It's an illiquid asset. But the majority of his assets are children. For the type of money, though, it's worth $3.8 million minus the $500,000 mark. That's correct. And this is 22%. So even on the current real estate market, I suppose to the extent that we're permitted, as judges, to be aware of these things, it's worth quite a bit. And there was $1.4 million in other assets, including… That's a retirement account that he's built up. Isn't that true, too? That's correct. But he also has a $700,000 annual household… And on the other side of the coin, we have quite a bit of money lost. That's also true. But also quite a bit of income as well that the Court could look to in terms of ability to pay without even invading any assets. $700,000 a year in annual income, $11,000 a month in expenses. That's household income. That's household income. But under the Drieschen and Street cases are to be considered by the Court in terms of financial ability. It was Mr. Stone's own testimony that on his disclosure statement he had $11,000 of monthly income that he didn't pay himself because his wife paid. So, you know, I don't think that there should be any question about Mr. Stone's ability to pay and that it's an exponential… Well, how do you use the $1.4 million in the retirement account as being subject to the Court's consideration in ascertaining the comparative wealth of each individual parent? I think you make the argument, if I'm not mistaken, that the statutory prohibition against use of retirement accounts would only apply basically to garnishment situations where you're directly dipping into the account. But taking it into account as being part of the general financial condition wouldn't be prohibited. But yet I think that that's being, without meaning any derogation with this, a bit sophisticated because what it means is that you can dip into his other could get backup from his retirement account, which is really an indirect way of dipping into that retirement account. Well, I would respectfully disagree in the sense that the Jacobid case speaks only to the right of a party to collect a judgment against a qualified plan through a non-wage garnishment. It doesn't say anything at all about the consideration of one's wealth in How would that account be considered if not as a potential source of income during his lifetime to the father before retirement? Well, in this case, he's reached retirement age and has an obligation to take funds out on an annual basis or be subject to penalties. That's number one. But number two is that was never even our primary argument in terms of his ability to provide support to Michael because this is a man who was still earning income. And the evidence was that in 2009, the last year that there was testimony He hadn't retired to reach the age of retirement. He was 71 years old. But I can tell you personally that there's a big difference between reaching an age of eligibility to retire and actual retirement. But he testified that he had $350,000 of either collected or anticipated income himself, non-retirement, not his wife's in the year that we were in court. So, you know, I don't believe that you even need to reach the issue, although, again, I disagree that the court does not have, in fact, the obligation when assessing fee contributions. Putting aside the 18 percent, the 18,000 square foot deal that he was about to close for his lawyers, where do you get $300,000 in there without reaching into his wife's all the marital income or marital assets? That was all income that he had projected that he would collect in 2009, inclusive of the 18,000 square foot deal that you refer to. It was straight from his testimony. So I'd also like to point out, Your Honor, there's an additional case other than Baumgartner that I think is instructive here. And that's Kennedy. I think the Kennedy case factually is similar in many ways to the Stone case. And that is the child in Kennedy had a learning disability. He had psychological problems. And it was anticipated in Kennedy that within two to three years of the decision, he'd graduate from high school and that he'd be able to hold a job at a gas station, it was projected. So implicit in that decision, he was awarded this adult non-emancipated disability in that case. Implicit in that decision was the expectation that he would graduate from high school, that he would be able to hold a job, but that he would not be able to support himself financially, regardless of where he lived. And I think that when there's too much emphasis put on whether or not the child is able or if he's lucky enough to have the basic level of ability that Michael has to be able to be in an apartment and make a meal, ride a bus, that those are not things that lead to financial independence. And those do not constitute emancipation. But is financial independence the test here? Under Baumgartner, it is one of the significant factors to consider. And that's why there's no bright-line test. I mean, it is a statute and a rule of law that should be set up in a way to give the individual the best chance, the greatest incentive to do the best they can without being penalized by reaching a very basic level where they're basically living in poverty without their parents' care and be caught off. And that's what happened here. Wasn't the Kennedy child still a minor? Kennedy child was still a minor. But I don't believe that that really has a bearing, Your Honor. No? I don't, because the statute specifically states that the very application for the support can come before or after the age of majority. So wouldn't the fact of reaching the age of majority or minority still be a factor? It's a factor. And I suppose, again, that's the reason why there's no bright-line test. But I think that what's instructive in Kennedy is the fact that the things that happened in Stone were contemplated in Kennedy. There was an expectation that he was going to graduate from high school and that he was going to go get a job. But all of his high school courses were in the mentally challenged portion of the curriculum. And, Michael, the vast majority of the classes he ever took in high school were the special education department classes. Incidentally, someone refers to the fact that this was not an exclusive private high school but a local public high school. And I think – I'm not a North Shore person, but I think it would be terribly offensive to a lot of people in the North Shore to call Newtrier just a local public high school. Well, I think that Newtrier has an excellent reputation. I think that the fact remains, though, that he was in the special education wing of a very good high school. The fact was he was always a special education student. When you look at the cognitive testing that Dr. Holly Sobel conducted in this case, at his level best, he's operating at the level of an eighth grader today and in many ways is at a third grade level, particularly in math skills. He doesn't read a clock. He can't do math. So I don't think that anybody is challenging the cognitive functioning that he is operating at, which is low. And in and of itself would be an impediment to him having any kind of job that would give him sufficient income to support himself, but that taken in connection with the psychological issues that he has, in particular the borderline personality, that causes him to be in essence antisocial. He can't maintain relationships in his personal life, let alone at an employment situation. Well, but being devil's advocate here, and I'm not necessarily as non-emotionally responsive to these kinds of things as you would think, but just to be a devil's advocate under these circumstances, how much of these characteristics shown on his on-job performance would necessarily be present if he already didn't have selected avenues of outside support and alternative sources of support and contribution to his well-being. And the fact of the matter is that the judge did not give high regard to Sobel's testimony and the arguments that you pose against the judge's rejection of her testimony don't necessarily fly because those arguments that you make would deal with her qualification as a witness, not with her credibility or stature in the eyes of the judge. In other words, if a judge is free, as he is, and as you don't contest, and you can't contest, to reject expert testimony, a judge saying that he's going to reject the testimony of a psychologist who may hold high appointed office in a recognized hospital or university, but whose area of practice is limited to other kinds of cases, to child cases, not to adult cases, she may be eligible to testify, she may be a qualified witness, but that doesn't mean that she, by force of law, compels the judge to adopt her testimony. I would ask, and I know you've already carefully considered it, but to look back at the trial court's ruling and explanation as to why he was critical of Dr. Sobel's testimony, because Dr. Sobel administered five different tests, including the MMPI and the MCMI, the most reliable and frequently used psychological tests. And for every diagnosis she made... But those were two tests, I guess, the Minnesota multiple and another test. But those tests don't purport to cover the waterfront, do they? But she covered... insofar even in the areas in which they purport to reach. I think that particularly the MMPI is considered to be very reliable. I know, but none of those tests is omniscient, or purport to be omniscient. Indeed, but with that said, when you have five different tests and clinical interviews and the DSM application as well, and a witness that testifies that every diagnosis was confirmed, not by one test, but by each of the tests, there's a greater weight to that testimony. And that testimony from Dr. Sobel wasn't even addressed by the trial court at all, in any way. But even with taking her testimony, basically what her conclusion is, is that he's not capable of working full-time. That is correct. So, again, wouldn't that be one factor that would be considered as opposed to the only thing? Even if you considered her testimony, it basically is, well, he's disabled because he's not capable of working full-time. Isn't that really all she ended up saying? I don't believe that she concluded that he is disabled because he can't work. No, he is disabled. He is disabled, and those disabilities prevent him from maintaining full-time employment. And that's one of the factors to consider. Because, frankly, he could be disabled, and the cognitive disabilities could exist alone. There could have been no testimony with regard to the psychological disabilities. I believe the court still could have and should have concluded that he was not emancipated, will never be able to be financially independent, and is exactly the individual that the state enacted 513 to protect. Because in the absence of parental support, he will be homeless. He will not be able to live somewhere where he can afford. And one of the crucial elements to all of this is that 513A2 doesn't say the level of support should be survival level, which I think goes to your earlier question about whether or not he could afford to pay his expenses from the initial award in the 1993 judgment. 513A2 says that the support should be based upon the standard of living that would have been enjoyed had the parties remained married. So that's when you look at the household income of Mr. Stone and his world traveled and his new car and all of the bells and whistles that this wealthy man has in relation to his son that's living in near squalor and ask ourselves whether or not that's what is intended by the statute. Isn't this the polar opposite of what 513 is designed to avoid? Thank you. Thank you. Are you going to touch on the fee issue? Do you want to do that in rebuttal? May I please report? Your Honor, Justice McBride, you hit the nail on the head a few minutes ago when you asked, when you said nine days of testimony. That's exactly right. The trial judge heard nine days of testimony over a period of eight months. He judged the credibility of a number of witnesses, and he found that Michael is, without caveat, emancipated. The trial court saw and observed Michael Stone testify. He saw and observed Roberta Stone testify, Daniel Stone, Robert Stone, and Dr. Hallie Sobel. The court's finding that Michael is emancipated is, in our judgment, clearly supported by the record. How do you explain his employment history? First of all, your opponent challenges your characterization in your brief, that Michael was employed for the majority of the time involved, when in fact his period of unemployment outlasted his period of employment. The period of employment itself involved part-time hours divided among several different jobs. In each of those jobs, there were personal relationships that tripped this person up, so as to either lead him to quit or to be fired. How does that explain, in a cogent, reasonable fashion, to negate the inference that this man finds steady employment to be at least very difficult? The issue of employment is not related to the issue of emancipation. Except, according to your opponent, that seems to be Baumgartner's premise. Now, I've got to re-read Baumgartner to find that, but are you rejecting that contention? Absolutely, Judge. The Baumgartner case had absolutely nothing to do with the facts that were presented here. There's no question that Michael Stone had a number of jobs. So what? Even Howley Sobel, in her report, stated that at times... Isn't employability at least a factor in determining emancipation? And if it is a factor, how significant a factor should it be? Judge Vega considered all that. He considered all of the testimony. He considered the employment history. Michael had been employed at a number of jobs. Dr. Howley Sobel indicated that at times he was working at near full employment, including his position at Blockbuster. He was able to work. At the time of the hearing, he was unemployed, as were a million other people, or several million other people in this country. I think that that's a facile, very abbreviated, conclusory response. I think it's our job to get into the interstices of each employment opportunity to determine if there is a core element of disability that is reflected in each of those job experiences. But again, you point to the issue of disability. My position, Judge, is with respect to employment, to the extent that Michael's employment history related to either disability or emancipation, Judge Vega carefully considered that over a period of time. Well, that's our job also, to make that determination based on whatever standard of review we have. If it is an unreasonable determination, it will probably fall within our standard of review to reject it. Well, I believe the standard of review is abuse of discretion, and I do not believe that Judge Vega I think reasonable is a generic term that covers a very broad area. That's why I used it. But I still believe that the standard of review is abuse of discretion, and I believe that Judge Vega properly found that Michael is emancipated. He heard testimony. He saw Michael. He observed him. He observed all the witnesses. And based upon all of the evidence that he heard over a period of nine years. You know, it's one thing for the common law judge to preserve the right under the common law, unchanged by statute, to reject expert testimony and make his own psychological evaluation. But that doesn't mean that he automatically gets the dignity, in his opinion, as to these areas of judgment that involve special kinds of expertise, that his evaluation gets the weight that's either the equivalent of an expert opinion or compels affirmance. Well, as Your Honor pointed out, when Mr. Adas was up here, that is something that the trial judge would consider. That is something that the trial judge would consider, and then you decide whether or not those facts fall within the standard of review. Mr. Finkel, Bob Gardner states that each case should be decided on its merits. The circumstances and facts of each case should be decided. But what would you say the trial court should be looking at in terms of the circumstances or the, for lack of a better word, the factors that a court should consider in deciding whether or not a particular individual is emancipated or not? Well, the court in this case relied upon expressly a number of facts that were adduced at trial, undisputed facts. The undisputed facts are that Michael has never had a guardian or a custodian, has never sought to have a guardian or custodian. Since the judgment of dissolution, Michael … You said he did have the appointment of special counsel. During the course of the divorce, he had Joy Feinberg, but that doesn't establish a guardianship since the date of judgment or any kind of custodian. He does not live with Roberta. She left to go to California. Now, I suggest to the court that if Michael was not emancipated, that Roberta Stone would not have left him 10 years ago to live in California. And she testified under oath that she has absolutely no desire to have Michael be with her, and she's absolutely very comfortable with Michael being in Chicago while she is 1,700 miles away. That's not emancipation. Your Honor pointed out a few minutes ago regarding the issue of custody, custody of a parent, custody of a mother, custody of a father. He's not in the custody of a mother. He's not in the custody of a father. He's not in the custody of anyone. Well, do you agree with counsel's suggestion that somehow this custody was transferred from the mother to the brother? It was not. Is there any case law that would even suggest that that's something that exists in terms of emancipation? I don't know. There has never been a case cited to us in this case to establish that a non-parent assumed legal responsibility for a brother. All right. Well, one thing is clear, and that is that don't you agree that the record suggests that without some kind of help from a number of people, he definitely would not be able to even afford to live anywhere? And he was receiving help from a number of people over the years. Do you know what his Social Security income is, Social Security disability income? At trial it was testified to about $700 a month, and he was receiving money from his father. And was it testified as to how much that he can't go beyond in terms of part-time employment before which his benefits will be taken away? Because he was still paying at the time for some overpayments, wasn't he? A prior year, correct. All right. So did the record disclose, to your knowledge, what amount of income he could make to still receive his $735 a month? Not the specific dollar amounts. He did testify, and it was testified to, that he was repaying some of it at the time. He also testified as did his brother. Maybe it was $300. I don't know. But his rent in the apartment he was presently living in, was it $600 or $900? $600. $600. It was $600. He indicated $900 a month. I thought the record showed it was $600. That's my understanding. And there was no assistance by his brother. A lot of things happened to occur after 17 years as soon as this litigation began, supposedly. Does the fact that the two parents agreed to contribute, what, $50, $60 a month back in 1993, does that support the notion that he was emancipated, that that's all they were going to provide? I thought he was to provide $50, Justice, and she was to provide $10. Right. So $60, $50, $60 a month together. Together. That's what they were providing. $10 and $40. Does that support the notion that that would provide care for him and take care of him even then? That suggests to me that he was emancipated because $50 a month wouldn't cut it by itself even in 1993. But were there other provisions about the electric and? Yes. Roberts don't pay for electric. What else? Didn't he provide for something else? Medical insurance? Correct. Insurance, medical. He was responsible for his own phone bill. Correct. So he doesn't have medical insurance to the extent that he doesn't, actually he does, from the Social Security disability in addition to the monthly payments. He is provided with some form of Medicare or Medicaid. And Mr. Stone provided everything that was required to provide. He wasn't providing the $60 a week for his groceries. His mother wasn't. No. Who was doing that? The groceries was the $50 a week. I thought it was $60. So it was a week, not a month. That was a week. Okay. All right. And that was being provided for by both parties, or at least Mr. Stone over a period of time. And in terms of additional facts that the Court looked to and should look to, as Your Honor, the Court has seen from the record, it is undisputed that no one has any control or supervision over what Michael does during a given day. He does what he wants to do when he wants to do it. He takes care of himself. He takes care of the dog. He signs his own leases. He decides where to live. He does his own cooking and cleaning.  He does do laundry. He does do laundry. I thought I read that there was a representation. Well, he testified that logistically in his apartment he has to go downstairs, but he can do laundry and he does. He has a driver's license, but he doesn't drive. He has driven, but he's not driving now. He has a driver's license. He does travel to California. He makes arrangements to travel to and from work. He has an ATM card. He writes out checks. He has his own checking account. He decides when. But he can't balance his check. That's what he testified to. But the totality of those facts, Your Honors, supports exactly what Judge Vegas said when he ruled on our motion. Michael is the captain of his own ship, and that highlights the issue of emancipation. That's not a non-emancipated individual. Michael is emancipated, and he has been for some time. And the issue of disability, we can talk about how he sold his testimony and the deficiencies in her testimony and her deficiencies in her ability to testify about Michael, who does not define the type of person that she treats, which is children, having autism and so forth. The trial court heard her testimony over a period of two days, took meticulous notes about her testimony, and arrived at what we believe is the correct decision because she did not have the ability to state what she stated. So we can talk about the disability issue, but you don't even get to the disability issue if you find that Michael is emancipated, which I believe the evidence supports. And the abuse of discretion standard applies to the disability issue as well. And this court, under the abuse of discretion standard, as the court well knows, even if you disagree with Judge Vega's decision, that would not satisfy the standard. It has to be something a lot more than that. It has to be clearer, undisputable, and so forth. And, of course, Your Honors are certainly capable of arriving at that decision, but I believe using the standard that is appropriate, standard of review that's appropriate here, Judge Vega made absolutely the right decision. He heard 90s of testimony, reviewed all the evidence, and saw the witnesses. What place in this evaluation, as far as you're concerned, does economic independence, self-sufficiency play a part in determining emancipation? That is a part. That is one factor. Absolutely. And is there any question here that there was no economic self-sufficiency as far as you're concerned? I think there was largely economic sufficiency, in particular when Michael was working. I would point out to the Court, as you well know. Except for the fact that, what, he had five different jobs? He had an inheritance account. That was $40,000, which was being held by Danny. That hasn't been touched. How long would that last, realistically? Not long, but the point is, Judge, is that he's had it for a while and hasn't had to touch it. He hasn't had to touch it because his brother, out of the goodness of his heart, has been providing for him. That's correct. So let's just take that $40,000 and take it out of the discussion. Well, I'm just describing the numbers, Judge. For nine years, there was a Quicken report that Danny prepared. And it was about $45,000 over a nine-year period that he allegedly spent on behalf of Danny, including a retainer for his attorneys, and over $20,000 of that was for hair restoration products. And what point does that make? The point is, he's providing $400 a month toward his rent. He's talking to him on a regular basis. He's visiting him on a regular basis. When he travels, he takes him to the airport. He helps him get his plane reservations. He basically is being there as a support. We've had a discussion here, not only with Mr. Addis, but with you, focusing on the legalities. That's what we're stuck with. That's what our job is. But I want to say for the people who are not lawyers who are here, that I understand that having a disabled member of the family is a great stressor on the family. And it calls people to make decisions that are difficult decisions. And when you add that to a family that has been broken apart by divorce, that exacerbates the circumstances. And the fact that we're focusing on these legal issues as required to do does not mean that we are not caring about the circumstances of individuals and the decisions that have been made. And, you know, as you look at it, we see that different people in the family have reacted in different manners. And we're not here to judge the way that people have responded to that. You know, if everyone had stepped up to the plate maybe as Danny has, maybe we wouldn't have a court case to begin with. Nor are we oblivious to the fact that there have been close to a half a million dollars spent here on attorney's fees, which would have been profusely adequate to keep Michael in a manner satisfactory to everyone who loved him. So, you know, I just want everyone to know that, the non-lawyers, that we are not putting our heads into the sand about the significant issues that go beyond legalities. But we are focusing on that which we are required to focus on, which are the legalities. Anything further, Mr. Finkel? If I could just respond, Your Honor. For the record, I agree this is tragic. This is tragic on a number of levels. And I'm not unmindful of that as well, and my client as well, how tragic this entire situation is on many, many, many levels. And Judge Vega made it very clear before he ruled how difficult the decision was. He made it very clear this is a very, very difficult decision for him. He's following the facts, following the evidence, and applying the law to those facts. And I believe he made a very difficult decision, and I believe that he made the right decision in terms of the facts applied to the law. Thank you. Mr. Adams? A few points raised by counsel. Number one, the issue that no guardian was appointed for Michael, and he currently doesn't have a custodial parent, it's not required by Section 513. And the plain language of the statute places no prerequisite on the award of support on those facts. So I think that it's an issue that really ought not to be considered at all. Mr. Adams, why don't you follow up, if I may suggest, on your assertion that economic self-sufficiency is a sine qua non for emancipation. I have Baumgartner here if you need the case, and I would profit greatly if you would show me where in that case that's pointed out. Well, I mean, you know, just for starters, and I'm just looking at the headnote, number one. We're looking at the same version. But initially it says, whether the minor has voluntarily left the production and influence of the parental home. What page are you in? He's looking at a headnote. I was reading from the headnote, but I could find it. Somebody wrote the headnote, not necessarily the judges who made the decision. Give me one moment, I'll get there. You haven't clerked, I take it. I do. I think we all do. I'm looking at 930 Northeast 2nd, 1024. Oh, you're in Northeast, okay. You're looking at ILDAC? That would be 510. And it says that in determining whether a minor is self-emancipated, the court must determine whether the minor has actually moved beyond the care, custody, and control of the parent such that the minor no longer needs to be supported. The answer to this question depends on the relevant facts and circumstances of each particular case. Thus, courts should consider factors including, but not limited to, whether the minor has voluntarily left the protection and influence of the parental home, or whether the minor has otherwise moved beyond the care and control of the custodial parent, whether the minor has assumed responsibility for his or her own care, or whether the minor continues to need support. So clearly, the need for support is a factor that the Baumgartner Court is directing us to focus on. And I point out that on the same page, the court discusses in the context of the Baumgartner facts, there's a paragraph that begins, in her motion for reconsideration, Susan directed the court to the correct inquiry. And part of the correct inquiry was Susan's allegation that the conduct that he pled guilty to, that is the son in Baumgartner, could not have led him to becoming financially independent. And so I don't think that there's any question that financial independence is a strong factor in the totality of factors. But not necessarily dispositive. Not synonymous. Not synonymous. And there are other factors. And to that point, and I think that it's important to focus on this, is when there's a laundry list of things that Michael can do that is being listed to you. If you look back at the record, he's doing very few of those things without some level of assistance. And for instance, even living in his own home, there's testimony, repetitive testimony, that where if a pipe breaks, where to a normal person, it's a mundane event, we take care of it, we call a plumber, we deal with it ourselves. It results in a total meltdown. And the only reason why Roberta Stone was able to leave the state, number one, she needed to do it because of her own financial circumstances and be supported by her daughter, but it was because Dan is a car ride away to come in and do what needs to be done to help Michael. So I suggest to you that there's been a gross overstatement, both at the trial court level and today, about exactly what Michael can do. So I think that it would be an error to focus too heavily on his financial dependence, of which he clearly is. And also focus on the dependence that he has on his family, his brother. And you're right, there's no case that says that you can transfer custody from a parent to a brother that I'm aware of. But it goes to the totality of the factors. Supposing a child is, I shouldn't say a child, a person, a disabled person is abandoned by his parents. Does abandonment constitute emancipation? Not pursuant to Baumgartner that says that self-emancipation cannot be imposed. There would be an imposition of emancipation. That's the simple answer to that question. But what about the factor that seems to be uncontested, where everyone seems to be saying that the fact that he hasn't received any therapeutic treatment during the last 20 years has been his choice because people can't make him do what he doesn't want to do. And if there is a circumstance where you're saying that he's not independent, then one would presume that some of these life coping skills would be things that could be improved therapeutically. Where has been the supervision to get that done? And what legal authority would someone have at this point to compel him to do it? Well, 513 does not require affirmatively the disabled child to do anything to attempt to overcome that disability. But with that said, obviously I think that everyone would agree that it's a good thing to try to do. But my point goes to the emancipation point. Let's assume that there is something that could be done that would improve matters in his coping skills on a day-to-day basis. But if everyone agrees that they can't compel him to do it and nobody tried to compel him to do it, then isn't that a factor that argues for emancipation? It could be a factor that's offset by the testimony that says two things. Number one, that cognitive impairments are never going to go away. They're never going to improve. I'm talking about life skills. And the psychological problems, and I think that life skills fall under that umbrella, are likely to worsen and not improve, even with therapy. And Dan testified that he himself observed a decline over the last decade after the death of Michael's grandparents, to whom he was very close. So I don't know of any authority to suggest that because there's a disability that potentially could have been improved during the ensuing period of time before a petition that wasn't followed, that that then obviates the parents from parental responsibility and, in essence, emancipates the child. All right, thank you very much. Could I speak very quickly on the fee issue? That was the reserve. Yeah. I'm willing to withdraw whatever indication I gave of having an interest in your discussing it, but it's ‑‑ There's an element of unfairness to have it brought up in rebuttal. Except that we could allow a response. And since I've already indicated that you will have the chance in rebuttal, might I suggest perhaps that that be the case? I've already invited it, albeit in a moment of lack of full thought. I don't have any objection as long as ‑‑ You can briefly discuss it. There's no dispute about the standard review on this one, right? Right. Abuse of discretion. There's no ‑‑ Not manifest weight, not de novo, abuse of discretion. That is correct. And we'll let counsel respond. And I'll make it very, very simple and quick. Contributions appropriate where there's a demonstrated inability to pay fees without undermining one's financial ability. Roberta Stone owns $90,000 in fees. She has $38,000 left to her name. She has no significant income. If she does not receive a contribution, her financial stability will not be undermined. It will be decimated. It is a clear abuse of discretion. I ask Your Honors to look to the Schreuer case that was decided earlier. It would depend at least on the good faith in bringing, in incurring those expenses and bringing the action. There's an element of ‑‑ If there's a lack of good faith, then contribution is not warranted under any case law. Reasonableness, I think, is inherent in any fee request. And I would submit to you that there was only good faith here. And the fees have to be reasonable to boot. And the question of whether they're reasonable under these circumstances is an open one. As I'm looking at two silent lawyers attending this proceeding. But it's also a case that's taken on, I think, a lot of meaning to all involved. So I would ask Your Honor not to read anything into the number of lawyers present. Other than it's an issue that is very important to all of us. And I would also say in the context of considering that, it was pointed out already that Mr. Stone spent $400,000. Yeah, but the fees incurred on the other side were $180,000. Those were the fees. I understand. I said the other side because I'm not here to point fingers. And I guess that I would suggest to you that a review of the record would indicate why the fees were incurred, who took the positions that were taken. But with that said, I mean, over the support of an impaired son, the reasonableness of incurring these fees, which seem to denote some element of hostility or spite between the litigants, is an open one. I would only ask whether, because I believe that it's necessary for the trial court, if the trial court is going to make a determination that fees were not reasonable, to make some specific indication as to why those fees weren't reasonable, what fees were not reasonable. Instead of the pox on both your houses, that was the declaration at the conclusion of the case. And I'd also hasten to point out that there were comments repeatedly made about the refusal to settle the case based upon a pretrial recommendation that had been made by the trial court, which I think that is inherently impermissible and mandates a reversal. And that point alone, because the court talked about it, that opened the door for counsel to talk about it, and all around the courtroom there was discussion about Roberta Stone refusing to accept a pretrial recommendation that Mr. Stone was willing to take. And it clearly had an impact on how the judge dealt with the case at the end of the day.  And, of course, we're going to give you a chance to respond on that one issue if you choose to. Let me then thank the lawyers for a very spirited and well-presented argument and set of briefs, and we'll take the matter under advisement and issue a decision in due course. Thank you all. We're going to have a change in panel once again, so we'll be right back.